IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs February 11, 2014

## STATE OF TENNESSEE v. WAYNE CHARLES GREEN

**Appeal from the Circuit Court of Grundy County**
**No. 4942    Thomas W. Graham, Judge**

---

**No. M2013-01082-CCA-R3-CD - Filed March 28, 2014**

---

Wayne Charles Green ("the Defendant") pleaded guilty to theft of property of $60,000 or more. Pursuant to the plea agreement, the trial court sentenced the Defendant to a sentence of ten years. Following a sentencing hearing, the trial court ordered this sentence to be served in incarceration and ordered the Defendant to pay restitution of $123,901.22. On appeal, the Defendant argues that the trial court erred in denying probation or other alternative sentencing. After a thorough review of the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Robert G. Morgan, Jasper, Tennessee, for the appellant, Wayne Charles Green.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; J. Michael Taylor, District Attorney General; and David Shinn, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural Background

The Defendant was indicted on July 9, 2012, on one count of theft of property of $60,000 or more. He subsequently pleaded guilty to the indicted charge. At the Defendant's plea submission hearing, the State recited this factual basis for the plea:

Your Honor, the primary witness the state would have if we went to trial would be Glenn Basham. He's the owner of Basham Industries. Also a Steve Boyd, who is a CPA that was retained by Mr. Basham. Other employees of Basham Industry. Mark Wilson with the Tennessee Bureau of Investigation.

The testimony would be from Mr. Basham that [the Defendant] was an employee of his, at least, from March, 2008, until his termination in May of 2012. His testimony would be that the defendant's position there, he handled, basically, he was sort of like the accountant. In the business he handled all the money and the payroll checks, handled the purchases and receiving – receivables. After a four-year period Mr. Basham retained a CPA firm, they did an audit and they found where the defendant was writing himself extra payroll checks from different accounts that belonged to Glenn Basham. He was actually just writing himself, just straight checks to himself, and then he was using the in-house accounting procedures to try to cover up those checks. It took – well, it occurred over about a four-year period. The amount is close to somewhere around $150,000, which Mr. Basham would testify, and the paperwork would show that the Defendant embezzled or stole from Mr. Basham. . . . There would also be banking records from the defendant's own accounts be presented from his banks.

As part of the plea agreement, the Defendant agreed to a sentence of ten years, with the manner of service and restitution to be determined by the trial court following a sentencing hearing.

At the sentencing hearing, Glenn Basham testified that he had operated Basham Industries and Basham Farms in Grundy County for approximately thirty-five years. In March 2008, Basham hired the Defendant as Basham's assistant for the purpose of the Defendant's running the business one day for Basham. At some point, Basham gave the Defendant access to and control over the financial accounts for the business. Basham fired the Defendant after four years because, over time, Basham felt that he could not trust the Defendant. Basham insisted, however, that his decision to fire the Defendant had nothing to do with money. After the Defendant was terminated, Basham's CPA and his office staff began to uncover some issues in the company's financial statements. This suspicion led to a full-scale audit by his CPA, which revealed that the Defendant had written himself 239 checks totaling approximately $149,000 without Basham's knowledge. The Defendant began issuing these checks in 2008 and continued until his termination in 2012. After time, Basham learned that the Defendant also had paid himself approximately $2,000 electronically. Basham estimated that the investigation cost him at least $4,000 but could not give an exact amount.

Basham did not recall the Defendant's having significant financial problems while working for him, although he did remember the Defendant's mentioning that he was trying to consolidate some debts.

On cross-examination, Basham stated that the Defendant was approximately twenty-three or twenty-four years old when he came to work at Basham Industries. The Defendant's mother had worked for Basham prior to Basham's hiring of the Defendant. Basham acknowledged that the Defendant advanced quickly within the business because of his good job performance. Over time, however, Basham noticed a change in the Defendant. Basham stated, "I started seeing [the Defendant] as a threat to my way of doing business." At the time the Defendant was terminated, he was earning $17 per hour. Basham agreed that this breach of trust disturbed him greatly.

Helen Mathis testified that she had worked for Basham Industries in 2008 and returned to work there after the Defendant was terminated. Her job description included "[j]ust general office duties," but she assisted Basham's CPA in the compilation of some financial records which detailed the unauthorized checks written by the Defendant. This list included checks in which the Defendant paid himself based on an improper accounting of hours and checks "that have no basis at all." Some checks were duplicate payroll checks to the Defendant, while others were listed in the company's financials as payment to a vendor. Mathis estimated that the Defendant wrote himself approximately 239 unauthorized checks from December 2008 until May 2012. These checks ranged in amounts from $300 to $1,250.

On cross-examination, Mathis estimated that she worked on these financial records from June 2012 until October 2012. She agreed that she spent several hundred hours in preparation and that she made approximately $14 per hour.

The Defendant testified that his wife had several medical issues, including problems with her kidneys, gallbladder, and mouth. His wife currently worked at Wal-Mart, although she had to take unpaid sick leave when her medical issues arose. Through his wife's employment, she received medical benefits and $450 every two weeks. The Defendant stated that he currently worked for Harmony Industries, a federal construction contractor. In this job, the Defendant's job responsibilities included "office work to getting out doing manual labor." The Defendant confirmed that the owner was aware of these charges. He stated that the only financial aspect of the company that he handled at Harmony Industries was payroll checks but that the owner personally signed each check. The Defendant explained that his job required that he travel to other states, including Mississippi and Louisiana. He estimated that his monthly income was approximately $3,500 to $4,000. His highest level of education was high school.

The Defendant estimated that his liabilities from a house mortgage and two car loans totaled approximately $65,000. He currently had $25 in his savings account and $400 in his checking account. The trial court asked the Defendant how the Defendant could account for all that he had embezzled, given that his testimony was that he had no money. Through a series of questions, the Defendant explained that the money went toward paying his mortgage and various other bills for household items.

The Defendant first worked for Piggly Wiggly after completing high school and then worked for a business two years later where he operated machinery. At some point during this time, the Defendant also worked for the Grundy County Board of Education as a technician. In these jobs, the Defendant occasionally ordered or purchased equipment on behalf of his employer. He acknowledged that he was accused of stealing a laptop from a Grundy County school, but he denied that he ever was reprimanded or questioned by law enforcement. The Defendant also denied stealing the laptop. He continued working for Grundy County schools for some period of time once he began to work for Basham Industries. When asked on cross-examination why he did not mention his employment with Grundy County in his written employment history, the Defendant stated that it was "an oversight."

The Defendant testified that he currently had a personal, computer repair business. On one occasion, he went to the business of his customer, Anita Meeks, for his computer repair business. With her permission, he set up a "remote access" in order to download software onto her computer remotely. The Defendant insisted that this computer was Meeks' personal computer and that he had no access to patient information related to her business. He could not explain why Meeks accused him of accessing the company computer.

When the Defendant began working for Basham Industries, he initially earned $12 per hour and at some point worked his way up to $17 per hour. The Defendant approached Basham to ask Basham for financial assistance at a time when the Defendant was having financial difficulty. Basham, however, told the Defendant that he did not loan out money.

The Defendant expressed that he was sorry for his actions, stating that he had caused pain not only for Basham but also for the Defendant's family. He stated that his going to prison likely would mean that his family would lose the house in which they were living. The Defendant estimated that, based on his current salary, he could pay restitution to Basham in the amount of $400 per month.

On cross-examination, the Defendant did not dispute Basham's assertion of the number of unauthorized checks written by the Defendant or the total amount taken from Basham Industries. He agreed that, including the unauthorized checks, the Defendant was

making approximately $75,000 per year, although his salary would have earned him only $30,000 to $40,000 per year. The Defendant acknowledged that, although he stole almost $150,000 from Basham Industries, he still was a payment behind on his $35,000 mortgage when he left his employment there. He further explained that the loans for two vehicles totaling approximately $35,000 were consolidated at one point with his mortgage.

Terri Shield, the Defendant's sister, testified that she currently worked as a registered nurse in Sewanee. She stated that, from her observations, the Defendant was a good father in that he "takes [his children] out and plays with them at the park. He takes them to school every morning." Shield did not recall "anything extravagant" from her many visits in the Defendant's home. She did not see the Defendant and his family taking trips often. From what she heard in the community about the Defendant's computer repair business, his customers seemed satisfied with his work. Shield stated that she and her husband were willing to borrow money from a bank, using her home as collateral, to pay the Defendant's restitution. She believed that the Defendant was capable of paying her back.

On cross-examination, Shield stated that she did not know the exact amount that the Defendant owed Basham Industries. When asked how much she was willing to borrow for restitution, she said approximately $20,000. She was not sure that she and her husband could provide for the Defendant's family if he went to prison, given that they must provide for their own family as well.

At the conclusion of the proof at the sentencing hearing, the trial court noted that almost 150 of the unauthorized checks deposited by the Defendant could have been individual felonies. Therefore, the trial court stated that the State was "doing the Defendant a favor" by charging the Defendant the way it did. The trial court found that the stealing of this money was, in fact, independent acts taking place over a long period of time.

From the trial court's observations of the record, the Defendant began stealing an average of $870 a week starting in February 2012. The facts were not in dispute as to the amount stolen by the Defendant. The trial court noted that the Defendant was in a position of trust and that the Defendant did not handle his responsibility appropriately. The trial court also found that the Defendant had not been honest with respect to his employment with Grundy County schools.

The trial court found that the Defendant's household income, combined with his wife's income, was approximately $100,000 per year but that the Defendant provided no accounting as to where all of that money went. Accordingly, the trial court found the Defendant lacking in credibility.

Given the long-term nature of this period of stealing, the trial court, in considering appropriateness for confinement, found that the Defendant had a long history of criminal conduct. The trial court also found that anything other than incarceration would depreciate the seriousness of the offense, given the amount of money taken from one family's business. The trial court did not consider as a factor that measures less restrictive than confinement had been applied to the Defendant unsuccessfully.

In considering the nature of the criminal conduct, the trial court found that the Defendant had "sufficient income for him to live on without stealing from somebody." The trial court was concerned, given the Defendant's lack of forthrightness at the sentencing hearing, that the Defendant did not have great potential for rehabilitation. Finally, the trial court stated that the Defendant's serving his sentence in incarceration was not severe, given the nature of the offense.

Accordingly, the trial court sentenced the Defendant as a Range I offender to ten years' incarceration. The trial court ordered that the Defendant pay restitution in the amount of $123,901.22.[1] The Defendant timely appealed his sentence, arguing that the length of his sentence is improper.[2]

## Analysis

Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

---

[1] The record indicated that the amount stolen was $148,901.22. Basham, however, had received $25,000 from an insurance policy, so the trial court ordered restitution for the amount of the difference.

[2] The Defendant did not appeal the amount of restitution.

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2006).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (Supp. 2008). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2006).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

The Defendant contends that the trial court should have considered an alternative sentence to incarceration. Our supreme court recently held that the Bise standard of review also is applicable to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). Thus, in reviewing a trial court's denial of full probation, the applicable standard of review is abuse of discretion with a presumption of reasonableness so long as the sentence "reflect[s] a decision based upon the purposes and principles of sentencing." Id.

A defendant bears the burden of establishing his or her suitability for probation. See Carter, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-303(b) (2006)); State v. Mounger, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999). "This burden includes demonstrating that probation will subserve the ends of justice and the best interest of both the public and the defendant." Carter, 254 S.W.3d at 347 (internal quotation marks omitted). In determining whether to deny probation and impose a sentence involving confinement, the trial court should consider the criteria set forth in Tennessee Code Annotated section 40-35-103(1), supra.

Initially, we note that the trial court, in denying an alternative sentence, should not have placed weight on the factor considering the defendant's long history of criminal conduct. See Tenn. Code Ann. § 40-35-103(1)(A). The record does not indicate that the Defendant had any prior convictions. In fact, the trial court stated that it was relying on the repeated nature of the Defendant's behavior that led to his current offense.

Nevertheless, we discern no abuse of discretion by the trial judge in denying an alternative sentence in this case. The record reveals that the trial court conducted a painstaking review of the purposes and principles of sentencing and thoroughly considered all of the evidence before it prior to ordering incarceration. The record supports the trial court's consideration of the factor examining whether incarceration would avoid depreciating the seriousness of the offense. The facts are undisputed that the Defendant wrote a total of 239 unauthorized checks from December 2008 until May 2012. The Defendant embezzled approximately $149,000 over that period of time, and all of the money came from one family's business. The record clearly supports the trial court's consideration of this factor.

Moreover, the Defendant could give no accounting as to how this approximately $149,000 was used over that period of time. He testified that he used the money toward his mortgage payments and debts totaling approximately $65,000 but that, when he left his employment at Basham Industries in 2012, he still was a payment behind on his mortgage. Thus, the trial court properly considered the Defendant's lack of candor with the court in this respect. See State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994) (recognizing that "untruthfulness of a defendant can be the basis for a denial of probation") (citation omitted).

As set forth above, it is a defendant's burden to establish his suitability for probation. See Carter, 254 S.W.3d at 347. We agree with the trial court that the Defendant failed to meet this burden. Moreover, unless a defendant establishes that a trial court abused its discretion in imposing sentence, this Court may not overturn the trial court's judgment even if we preferred a different result. See id. at 346. In this case, the Defendant has failed to rebut the presumption of reasonableness we must afford the trial court's decision. Accordingly, we affirm the judgment of the trial court.

In summary, we hold that the trial court imposed this sentence in a manner consistent with the purposes, principles, and goals of the Sentencing Act. Accordingly, the Defendant is entitled to no relief.

## CONCLUSION

For the reasons set forth above, we affirm the judgment of the trial court.


_____
JEFFREY S. BIVINS, JUDGE